# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Malachi Olajuwon Smith,<br><br>　　　　　Defendant. | Case No. 2:20-cr-00087-JAD-DJA<br><br>**Report and Recommendation**<br><br>[ECF No. 40] |

　　While investigating a shoplifting/petty larceny call, North Las Vegas Police Department (NLVMPD) officers detained Defendant Malachi Smith at a 7-11 convenience store in North Las Vegas, Nevada where he was shopping with his friend.  During the investigatory stop an officer conducted a pat-down search on Mr. Smith, allegedly for officer safety, and recovered a weapon.  Mr. Smith now moves to suppress the weapon because the officer lacked reasonable suspicion or probable cause that Mr. Smith had committed a crime or that Mr. Smith was armed and dangerous necessary to justify the frisk.  Because I find that the officer's reasons to frisk Mr. Smith were not justified and the pat-down search was unconstitutional, I recommend that the motion to suppress be granted.

## Background

　　Mr. Smith is charged in a one count Criminal Indictment with Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (ECF No. 19).  The charge is the result of an investigatory stop on February 18, 2020, during which officers discovered a firearm while conducting a pat-down search of Mr. Smith.  Mr. Smith filed a motion to suppress evidence of the firearm on April 2, 2021.  (ECF No. 40).  The Government filed a response in opposition to the motion on April 23, 2021.  (ECF No. 44).  Mr. Smith filed a reply on April 30, 2021.  (ECF No. 46).

I conducted an evidentiary hearing on the motion on June 29, 2021. (Mins. of Proceedings (ECF No. 54)). Two NLVMPD officers testified about their involvement in the investigation which led to the pat-down search. The parties admitted six exhibits, including the body camera video of both officers and the dispatch audio recording directing the officers to the 7-11. (*Id*.). When the hearing concluded, I indicated that I would issue a written report and recommendation and took the matter under advisement. This report and recommendation follows.

**Testimony and Evidence**

On February 18, 2020 at 2:18 a.m. NLVMPD dispatch issued a call of a shoplifting/petty larceny from a 7-11 convenience store located at 785 West Craig Road in North Las Vegas, Nevada. Dispatch reported that two adult black males with dark hoodies were putting merchandise into their clothing and that the reporting individual thought they were going to walk out without paying.[1] Officer Luis Macia Venegas responded first, arriving about 60-seconds after the call, and parking directly in front of the 7-11. Officer Joseph Razo also responded to the call, arriving a short time later.

Officer Venegas immediately entered the store after arriving. He located two individuals—one of whom was Mr. Smith—matching the dispatcher's description at the opposite end of the store by the processed cheese machine with the clerk standing close by. Nobody else was in the store. There was nothing about the two's actions that would raise a suspicion of danger and the clerk was clearly not intimidated or afraid of them. Shortly after Officer Venegas entered the store and observed the individuals, they took what they had purchased and left.

As Officer Venegas followed the two individuals, he spoke briefly with the clerk who showed him a receipt and stated that any other merchandise the two had that was not on the receipt was stolen. Officer Venegas asked no further questions but followed the individuals out of the store and ordered them to drop what they had, walk to the front of his vehicle, and place their hands on the hood. Officer Venegas then radioed dispatch that he had detained the two.

---

[1] *See* ECF No. 55, Exhibit B.

After following orders, one of the men asked Officer Venegas why they were being detained. Officer Venegas responded that, "they called us and said that you guys were taking stuff without paying." Mr. Smith stated that he did not take anything, to which Officer Venegas responded, "well that's what they're saying, so I've got to investigate." The second individual turned to Officer Venegas, briefly took his hands off the hood, and admitted to taking candy bars. Mr. Smith also briefly lifted his right hand off the hood, but quickly placed it back at Officer Venegas' direction. Mr. Smith again denied doing anything. 31-seconds after Officer Venegas detained the two, Officer Razo arrived[2]

Receiving a non-verbal signal from Officer Venegas, Officer Razo handcuffed Mr. Smith. Mr. Smith did not struggle or resist being handcuffed. Officer Venegas handcuffed the other individual. As he was being handcuffed, Mr. Smith again denied doing anything. Officer Venegas reiterated that they were being detained for further investigation and radioed dispatch that the two had been detained. Officer Razo then moved Mr. Smith to the side of his patrol vehicle approximately 25 to 30 feet away from Officer Venegas and the other individual. It took 42-seconds from the time Officer Razo arrived to handcuff Mr. Smith and move him to the side of his vehicle.

After Officer Razo took Mr. Smith to his vehicle, Officer Venegas asked the other individual where the candy bars were located. That individual responded they were in his front pocket. Officer Venegas reached into the pocket, found the candy bars, and placed the individual under arrest.

Meanwhile, Officer Razo ordered Mr. Smith to stand by his vehicle. Mr. Smith complied, again denying doing anything wrong. The conversation was cordial, and Officer Razo asked, "so why would they tell us you guys were in there putting stuff in your pockets?" "Sir, it was not me that put anything in my pockets," Mr. Smith explained. "Ok. But you were with your buddy, and he decided to do that?" Officer Razo asked, and began patting Mr. Smith down.

---

[2] Timing references are taken from the time listed on the body camera video.

Mr. Smith again denied having "anything on me," yet Officer Razo continued, stating simply, "you're being pat[ted] down," without explaining why. Upon discovering a weapon, Officer Razo placed Mr. Smith under arrest. It took only 16-seconds from Mr. Smith's arrival at Officer Razo's car until Officer Razo began patting him down. Moments prior to Officer Razo conducting the pat down search a third officer arrived at the scene in response to the call.

Throughout the entire incident, body camera footage shows that Mr. Smith was polite (referring to the officers as "sir") and compliant. He moved to the front of Officer Venegas' vehicle, dropped what was in his hands, and placed his hands on the hood of the car. As the other individual essentially confessed to the crime, Mr. Smith only briefly removed his right hand from the hood, immediately replacing it upon being ordered to do so.

Contrary to the officers' later testimony, body camera video shows nothing indicating that Mr. Smith is a danger or a flight risk. Officers Razo and Venegas both testified that the 7-11 is located in a high crime area in which they respond to all types of calls, including non-violent property crimes and a plethora of violent crimes. Officer Razo testified that the high crime rate, along with a loose-fitting jacket that Mr. Smith was wearing, made him concerned for officer safety which led him to conduct the pat down search.

## Legal Standards and Analysis

### 1. Fourth Amendment

The Fourth Amendment addresses "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347, 353 (1967). It protects "people, not places," and extends to brief investigatory stops of persons or vehicles that fall short of traditional arrests. *Id.* at 351; *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). However, the Fourth Amendment is satisfied if the officer's actions are supported by a reasonable suspicion. *Arvizu*, 534 U.S. at 273.

### 2. *Terry* stop and frisk requirements and the exclusionary rule

In *Terry v. Ohio*, the Supreme Court held that an officer may briefly stop individuals for investigative purposes if the officer has a reasonable suspicion that the individual is engaged in criminal activity. *Terry*, 392 U.S. 1, 21-22 (1968). The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Id.* at 21. Determining whether the officer's "specific and articulable facts" constitute reasonable suspicion requires an objective, totality-of-the-circumstances evaluation. *Id.* at 21-22.

But a *Terry* stop does not automatically entitle the officer to perform a *Terry* frisk—also called a pat down—of the stopped individual. *Id.* at 23. An officer may only perform a *Terry* frisk if he "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous." *Id.* at 24. The stop and the frisk are thus two independent intrusions into the individual's privacy, so the officer must have an independent, reasonable suspicion to justify each act. *See Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016). "A mere inchoate and unparticularized suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion, and circumstances suggesting only that a suspect would be dangerous if armed are insufficient. There must be adequate reason to believe the suspect is armed." *Id.* (internal quotations and citations omitted). "Importantly, reasonable suspicion must be individualized: even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Id.* at 877 (internal quotation and citations omitted).

Evidence obtained from an illegal *Terry* frisk must be suppressed under the exclusionary rule. *See Wong Sun*, 371 U.S. at 484 (evidence seized during an unlawful search "cannot constitute proof against the victim of the search"). "The exclusionary rule extends beyond evidence directly obtained in violation of the Fourth Amendment to the fruits of the poisonous tree." *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989). Thus, if the court finds that either the *Terry* stop or the *Terry* frisk was not supported by reasonable suspicion, then the court

must exclude the fruits of the illegal search, in this case, the weapon found on Mr. Smith during the frisk.

### a. The officer's *Terry* stop was supported by reasonable suspicion.

Officer Venegas' original investigatory stop of the two black adult males, and Officer Razo's continued detention of Mr. Smith for the purposes of that investigation, were supported by a reasonable suspicion for two reasons. First, the dispatch call reported that two adult black males with dark hoodies were putting merchandise into "their" clothing and the reporting individual thought "they" were going to walk out without paying. Because dispatch implicated both individuals, Officer Venegas had reasonable suspicion to stop and investigate both of them. Second, when Officer Venegas arrived at the store, the only individuals in the store were two adult black males with dark hoodies talking with the store clerk. After the two individuals left, the store clerk informed Officer Venegas that anything they had in their possession that was not on a receipt she showed Officer Venegas, was stolen. Officer Venegas thus had a reasonable suspicion to stop the two individuals who matched the dispatch description of the alleged perpetrators, especially after the clerk said that they were the individuals referenced in the dispatch call.

Officer Venegas' detention of the two individuals for a brief period at the front of his vehicle was also supported by reasonable suspicion that the two individuals had committed petty larceny or shoplifting. The individual's admission that he took candy bars further confirmed this reasonable suspicion. While Mr. Smith denied taking anything, his involvement and association with the individual who did—taken together with the dispatch call that both individuals were shoplifting—supported Officer Venegas' reasonable suspicion to detain the two for further investigation.

Finally, Officer Razo's continued brief detention of Mr. Smith for investigatory purposes was likewise supported by reasonable suspicion. Officer Razo testified that the individuals were separated so that they could continue the investigation and separately interview the two regarding their involvement. Given that Officer Razo only detained Mr. Smith's for a relatively short time

to further investigate his involvement in the shoplifting/petty larceny, Officer Razo's detention was supported by reasonable suspicion and justified under the *Terry* standard.

### b. Officer Razo's *Terry* frisk was not supported by reasonable suspicion.

Officer Razo's reasons for frisking Mr. Smith are not supported by reasonable suspicion. Officer Razo testified that he conducted the pat down search because: (1) the 7-11 is in a high crime area; and (2) Mr. Smith was wearing baggy clothes that could conceal a weapon. Neither of these reasons, taken in conjunction with the totality of the circumstances, justify Officer Razo's *Terry* frisk.

Officer Razo's first reason—the high crime rate—is unsupported. Both Officer Razo and Officer Venegas testified that the area around the 7-11 has a high crime rate for which they receive numerous calls for a plethora of crimes, including non-violent property crimes and various violent crimes. But without other facts that Mr. Smith might be armed and dangerous, that the officers stopped him in a high crime area is too generalized to justify a *Terry* frisk. *See Thomas*, 818 F.3d, 877; *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990). Standing alone, the high crime rate does not justify a *Terry* frisk. When taken together with the totality of the circumstances of the stop and investigation, it carries even less weight.

That the crime was minor, the scene was casual, and the surroundings were empty diminishes the weight of the officers' high crime justification. The officers were dispatched for shoplifting/petty larceny—non-violent property misdemeanors—for which individuals are not necessarily arrested and taken into custody. Nothing in the dispatch call indicated the individuals were armed, had threatened the clerk or anyone else, or were otherwise dangerous. Indeed, when Officer Venegas arrived at the store, Mr. Smith and the other individual were the only people present and their interaction with the clerk appeared casual. Given it was 2:18 a.m., there was no one else in the vicinity of the investigation other than two individuals who entered the store shortly after Officer Venegas exited. These individuals are never seen again on the video. Thus, there was no danger to the public justifying the frisk. There simply was nothing about the circumstances of the stop or the location of the store in an allegedly high crime area that would indicate that Mr. Smith or the other individual were dangers to justify a *Terry* frisk.

     Officer Razo's second reason to justify the search is equally unpersuasive. Officer Razo testified that baggy clothes could conceal a weapon. In his investigation report however, Officer Razo described Mr. Smith's jacket as "loose fitting," not baggy. Officers did not testify to seeing a bulge in Mr. Smith's jacket or any other indication that the jacket may secrete a weapon. Mr. Smith did not reach for the jacket, make furtive actions indicating something might be concealed, and certainly never showed intent to flee or otherwise obstruct the investigation. The investigation also took place in February during the cool, early morning hours when wearing a jacket is normal behavior. In these circumstances, Mr. Smith's loose-fitting jacket—that Officer Razo only later described as baggy—would not support a reasonable suspicion justifying a *Terry* frisk.

     Although not included in Officer Razo's stated reasons for conducting the *Terry* frisk, the officers testified that the individuals' behaviors made them wary of danger. But body camera video contradicts these statements. Officer Venegas testified that he witnessed red flag behavior that caused him a concern that the individuals would be a danger or a flight risk, including looking around, not following his orders, and removing their hands from the hood of his vehicle. Body camera video belies these claims. While both individuals looked back at Officer Venegas and may have looked around, it does not appear that they were looking to flee. While the second individual removes his hands from the hood to admit to stealing, and Mr. Smith briefly raises his right hand, both immediately place their hands back when directed. Most importantly, Officer Venegas never told Officer Razo that the two were potentially dangerous or flight risks prior to Officer Razo arriving. The only information Officer Razo had from Officer Venegas was a hand signal to handcuff the two. While Officer Razo testified that this told him the individuals might be dangerous or attempting to flee, other than the hand signal, he had no specific information that Mr. Smith might be dangerous.

     Officer Razo also testified that Mr. Smith looked nervous, looking side to side, perhaps for an escape route. This too is belied by the video where Mr. Smith politely addresses Officer Razo, follows his instructions, and does nothing to indicate that he would be dangerous or attempt to flee. There simply are no facts supporting reasonable suspicion for Officer Razo to conduct a

*Terry* frisk. And that he almost immediately conducts it after only briefly discussing the investigation with Mr. Smith indicates that Officer Razo was going to conduct a *Terry* frisk regardless of whether he had reasonable suspicion.

Based on the record, there is not enough evidence to support a reasonable suspicion that Mr. Smith was armed and dangerous thereby justifying a *Terry* frisk. At the time Officer Razo conducted the *Terry* frisk, Mr. Smith was in handcuffs, detained one-on-one, while a third officer arrived on the scene. Given the totality of the circumstances, there was no justification for Officer Razo's belief that Mr. Smith was armed or dangerous to necessitate a *Terry* frisk to continue the investigation. The fruits of this illegal search—the weapon found on Mr. Smith—must be suppressed.

**Conclusion and Recommendation**

IT IS THEREFORE RECOMMENDED that Mr. Smith's Motion to Suppress Evidence (ECF No. 40) be GRANTED.

**Notice**

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: July 16, 2021

Daniel J. Albregts
United States Magistrate Judge